UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STELLA ROMANSKI,

     Plaintiff,

vs.

                                 Case No: 02-CV-73358
                                 Hon: Lawrence P. Zatkoff

DETROIT ENTERTAINMENT, L.L.C. d/b/a
MOTOR CITY CASINO, a Michigan
Corporation, MARLENE BROWN, GLORIA
BROWN, ROBERT EDWARDS, and
JOEETA STEVENSON,
Jointly and Severally,

     Defendants.
_____/

NEIL H. FINK (P 13430)
S. DAVID McNEILL (P 17544)
Attorneys for Plaintiff
185 Oakland Ave., Ste. 250
Birmingham, MI 48009
(248) 258-3181

JOHN B. FARRELL (P 27627)
ROBERT F. MacALPINE (P 31626)
Attorney for Def. Detroit Entertainment
1000 Woodbridge
Detroit, MI 48207
(313) 446-1530
_____/

# PLAINTIFF, STELLA ROMANSKI'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## Introduction

This Court should deny Defendants' Motion for Summary Judgment, in its entirety, for the reason that a question of fact exists as to each theory of liability asserted by Plaintiff, Stella Romanski.  Defendants' contention that Ms. Romanski committed a felony, punishable by a fine of up to $100,000.00 and a prison sentence of up to 10 years, when she picked up an errant nickel coin left in the tray of a slot machine by a previous winning bettor is a feeble, last minute attempt, to avoid responsibly for their shocking and deplorable conduct in this case.

Defendants entire Motion is premised on the erroneous conclusion that the Motor City Casino retained ownership of the nickel coin, even though, the coin was "payed out" to a winning bettor who lost or abandoned the coin.

The Motor City Casino claims it is the owner of the coin pursuant to an unwritten, and unpublished, policy that coins found in slot machine trays are its property, but coins found on the floor of the casino are property of the finder, in this case, Ms. Romanski.  The Michigan Gaming Control and Revenue Act is silent on this issue.

However, under Michigan Common Law principles of lost and abandoned property, Ms. Romanski, as the finder of the nickel coin, has rights superior to that of the Motor City Casino.  If the property was abandoned, title to the coin was divested from the winning bettor and became the property of Ms. Romanski.  The owner of the premises on which it was found, in this case the Motor City Casino, has no claim in

2

the property. <u>Whitman v Muskegon Log Lifting & Operating Company</u>, 152 Mich. 645, 116 N.W. 614 (1908). If the property was merely lost, and the winning bettor did not have the requisite intention to relinquish the right to the coin necessary to establish an abandonment, Ms. Romanski has first possessory rights better than anyone (including the casino) except the winning bettor. <u>Willsmore v Township of Oceola</u>, 84 Mich. App. 514, 270 N.W.2d 254 (1978), appeal after remand, 106 Mich. App. 671, 308 N.W.2d 796 (1981). In any event, the ownership issue is a question of fact for the jury. <u>Log Owners' Booming Co. v Hubbell</u>, 135 Mich. 65, 97 N.W.2d 157 (1907).

## Counter Statement of Facts

On the morning of August 7, 2001, Plaintiff Stella Romanski, a 73 year old grandmother, boarded a Motor City Casino bus in Sterling Heights, Michigan with two of her friends, Dorothy Dombrowski and Linda Holman and was driven to the Motor City Casino in Detroit, Michigan. (Exhibit 1, Stella Romanski Deposition, pg. 8). Ms. Romanski paid $9.00 for a ride on the "senior bus" and a buffet lunch at the Motor City Classic Buffet. (<u>Id</u>., pg. 9). Ms. Romanski was previously issued a players club card by the casino that accumulates points as she gambles that she may redeem with the casino.

Ms. Romanski and her friends arrived at 11:30 a.m. (<u>Id</u>., pg. 10). Ms. Romanski left her friends to gamble and made plans to meet them at 1:30 p.m. for lunch. (<u>Id</u>., pg. 11). At about 12:30 p.m. Ms. Romanski testified she was playing the

3

nickel slot machines. She played one machine, left it, looked at two other machines and came back to the original (Id.). She picked up a nickel coin that had been left in the tray by a winning bettor who played the machine previously. (Id.).

Ms. Romanski testified she then went around to the machine that "I was playing right along and I put $20.00 in and the nickel coin. (Id.). Ms. Romanski played the slot machine "around 13 times. . .and all of a sudden four people surrounded me, three people behind me. . . I stood up. Two were in font [sic] of me and two were in back of me. I was very embarrassed, because everybody was watching us like a criminal, and we went up a escalator, two in front and two in back" (Id., pg. 12).

Ms. Romanski was taken to the security office. She testified "They sat me behind the desk. One stood in front of me and a guard stood at the door, the guard that came with us so that I - - so that I couldn't leave." (Id., pgs. 12-13).

Ms. Romanski "asked the tallest of the three women hovered over me" what this was all about "and she says to me I stole a coin from the tray and that's theft. I looked at her and I said what are you talking about? And she said it a couple of more times, I stole a coin and that's theft." (Id., pg. 13). Ms. Romanski responded "I couldn't believe it. I couldn't believe it. I mean I'm a grandmother of nine children and I didn't understand. I just couldn't believe it. I kept saying what are you talking about? I told them that I didn't remember taking the coin, put [sic] if there was a coin in a tray or on the floor, I would have picked it up like anybody else would have. Then

4

I was crying." (Id.).

The Motor City Casino security guards "took my coins that I had in my cup and threw them on the table and counted them. It came to $14.10. She cashed in, brought it back and on the table she laid down a ten, four ones, two nickels and took one nickel that belonged to the casino." (Id.). Ms. Romanski testified they then "took a picture of me, photographed. They asked for my driver's license and they asked for my social security card and I didn't want to give to them the card, but I gave it to them because she said she was a policewomen. And my [players card] that I put in the casino machine, they took that as well." (Id., pg. 17). The casino kept her players card, made photocopies of her driver's license and social security card and returned them to Ms. Romanski. (Id.).

Ms. Romanski looked at her watch "and it was 1:30. I said can I please go down and have lunch, because my friends were downstairs. She said I lost all my rights. And I said what do you mean? And she said you can't go down. I said can I go down and tell my friends that you're kicking me out of the casino? She said no. I lost my rights. I could not go down" (Id., pg. 18).

Ms. Romanski was not permitted to eat lunch. She testified she was told by the security guards that her "bus will be there at 3:00 o'clock, the 109, and I was to get on it." (Id., pg. 19).

As the security guards were escorting Ms. Romanski out of the casino, she said "I'm sick, I'm really sick, could I go to the bathroom? . . . [Defendant, Marlene Brown]

5

followed me into where I went to the bathroom.  She was right by my stall.  I went to the bathroom and when I came out they escorted me, somebody in front and somebody in back.  By then I don't remember if it was two, four or what.  We went all the way down and they took me over to a chair.  It was valet parking.  And they said now you see that over there, way over there? [across Grand River] and I said yes. Your bus will be there at 3:00 o'clock.  Board it." (Id., pg. 19).

At 3:00 p.m. the 109 bus arrived and Ms. Romanski testified she did as she was told.  "I had to go way down around a four foot wall, cross Grand River at 3:00 o'clock, which is the busiest time, and I saw my bus and it said 109.  Then I went to the front of the bus and the bus said it was out of town, it wasn't going where I wanted it to go.  It was either Bay City or Saginaw.  I think it was Saginaw.  But it wasn't going where I had to go.  So the bus left.  There's no chairs.  It was the hottest day and I'm [on Grand River] and no one's there, and I was afraid to go back because they told me not to come back.  I was barred from it, and I didn't know what to do."  (Id., pg. 20).

Fortunately, Ms. Romanski's friends then came out of the casino to look for her and found her standing outside on Grand River.  She testified "I was explaining what had happened and how terrible it was and they said, you know, I just couldn't believe it.  And then I just almost got through and the people from the casino came out and my next door neighbor [Dorothy Dombrowski, age 77] says this is really stupid, and the tallest woman, I think her name was Brown [Defendant Marlene Brown, age 38]

6

came up to my neighbor [Ms. Dombrowski] and came right up to her like this and said are you calling me stupid?  And [Ms. Dombrowski] says no, I'm saying that this incident was stupid.  And she - - [Defendant, Joetta Stevenson] came out and told her Brown, get back into the - - get back into the casino, and [Ms. Brown] said she called me stupid.  I thought they were going to fight.  I really did.  And I was against the wall.  (Id., pg. 22).  Ms. Romanski further testified Ms. Brown "looked like she was going to beat [Ms. Dombrowski] up." (Id., pg. 23).

Ms. Romanski was escorted across Grand River where she waited with her friends until 5:00 p.m. when her bus came.  (Id., pg. 24).  Ms. Romanski testified "I was very embarrassed, humiliated. . . . Very shaken up, and wanted just - - I had diarrhea the rest of the day.  I didn't eat all that day.  I was a mess when I came home because I only had cereal at nine o'clock in the morning. . .I cried all the way home.  Ringing wet." (Id., pgs. 26-27).

Linda Holman testified that she was in the casino when Ms. Romanski reached her on her cell phone and said "four policemen - police people arrested her.  She thought they were police people." (Emphasis added) (Exhibit 2, Linda Holman Deposition, pg. 17).  She and Ms. Dombrowski found Ms. Romanski "standing on the corner of the building and she was just shaking.  It looked like she was going to pass out and she really couldn't even talk to us right away.  She was just shaking." (Id., pg. 16).  Ms. Romanski told Ms. Holman "something about they had arrested her because she took a nickel - - she didn't remember taking a nickel - - that was in the

7

slot machine." (Id., pg. 17). Ms. Holman further testified "it was extremely hot. I'm not sure how long we stood out there. We talked, the three of us, trying to figure out what happened. We really couldn't figure out what happened. None of it made sense." (Id., pg. 17). . . .and [Dorothy Dombrowski] said something about, you know, how stupid a situation for that to be, how stupid for them to throw her out and, wow, once she said that, this one larger, tall security guard [Marlene Brown] came right over like over the top of us and was yelling at Dorothy, who are you calling stupid. . .And I mean [Ms. Brown] went out of control. . .This security guard went ballistic on Dorothy. And there was another lady [Joetta Stevenson] came and tried to calm down [Ms. Brown]. When that women came I went and talked to her and asked if Stella could - - you know, she had paid for lunch. I said, you know this lady is about ready to pass out, she needs to eat. I said you know, she has the right to have lunch. She paid for it. . . . [Ms. Stevenson] said no, she didn't have any right to have lunch she has committed a felony against us, she has no right to eat." (Id., pg. 20). . . .I again said she has the right to eat. She's going to faint and [Ms. Stevenson] says when you steal from us, you lose all of your rights." (Id., pg. 22).

Ms. Dombrowski similarly testified she found Ms. Romanski standing outside the casino. (Exhibit 3, Dorothy Dombrowski Deposition, pg. 15). Ms. Romanski told her "that she was playing the nickel machine and security came and I think she said there were four members who surrounded her and asked her to withdraw whatever money she had put into the machine. As I understood it, she had put a $20 bill in

there and to withdrawn the money and to follow them. I think the thought she related to us crossed her mind that she won some sort of prize because they're always advertising they're giving away money for some reason or another." (Id., pg. 15).

Ms. Dombrowski spoke to Defendant [Robert Edwards] and "said what exactly did she do. He said she stole money from the casino. He used the words interchangeably, she committed a larceny and a felony and/or a felony." (Id., pg. 18). Ms. Dombrowski further testified "at some point I said this is the stupidest thing I've ever heard of. . .and Marlene Brown took exception to it, became very belligerent and insisted I called her stupid. And I said I did not. . . .she came right up in to my face and said yes, you did. . .and I said your word is as good as mine and someone at this point pointed out that everything was on tape and I said wonderful, I'm looking forward to seeing it on tape so that I'm vindicated because I did not call her stupid. She is 30, 40 pounds heavier than I am. She was 30 to 40 [years] younger than I am and much taller. (Id., pgs. 18-19). This videotape as well as the videotapes of Ms. Romanski taking the coin, being arrested and her interview in the security office were requested by Plaintiff's counsel in discovery. Even though the casino agreed to a protective order in state court permitting Ms. Romanski to copy the videotapes at her expense, the casino now claims that none of these videotapes exist.

Defendant Marlene Brown testified that when she made the arrest "I always have my badge, but it wasn't out to be seen. But when I approach someone, I'll show them that I'm an officer." (Exhibit 4, Marlene Brown Deposition, pg. 46). Ms. Brown

9

carries a hidden microphone, because before she can "even move a patron, surveillance has to pick them up on camera." (Id., pg. 48).

Prior to approaching Ms. Romanski, Marlene Brown testified she "flipped up [her] jacket, and I showed [Ms. Romanski] my badge. . .I lifted up the bottom part because I always kept my badge and my handcuffs on my belt." (Id., pg. 59).

Ms. Brown testified that patrons can keep coins they find on the floor. (Id., pg. 60). Ms. Brown admits she doesn't know if there is any written rule that delineates the distinction between coins found in trays and coins found on floors. (Id., pg. 60). Ms. Brown thinks there may be stickers on the machines. (Id., pg. 62).

Contrary to the statements made in her motion that she was simply acting as a private citizen making a citizens arrest for a felony committed in her presence, Ms. Brown testified "The only reason [Ms. Romanski] was taken to the office is because of her attitude. (Id., pg. 60).

Although Ms. Brown's testified that Ms. Romanski was loud and disruptive, the incident report form that Ms. Brown signed immediately after the incident states "suspect was escorted to security office without incident or injury." (Emphasis added). (Exhibit 5). Ms. Brown, along with a "uniformed officer", Gloria Brown and Robert Edwards accompanied Ms. Romanski to the security office. (Id., pg. 70). The officer had handcuffs that were visible. (Id.). Ms. Brown testified Ms. Romanski was detained in the security office for fifteen to twenty minutes, "It might have been a little longer." (Id., pg. 72).

10

The room where Ms. Romanski was taken has a camera "monitoring what's going on." (Id., pg. 74). Ms. Brown admits Ms. Romanski's lunch card and the nickel coin were taken from her. (Id.). Ms. Brown, contrary to the position taken in her Brief that Ms. Romanski committed a felony, reiterated in her deposition that Ms. Romanski was excluded from the casino "because of her attitude." (Id., pg. 75).

> Q    And just so I understand, what caused you to ask her to come to the office was because you thought she was talking loud and you wanted her to calm down?
>
> A    Right.
>
> Q    Any other reason?
>
> A    No.

(Id., pg. 98).

Ms. Brown admits Ms. Romanski was not permitted to eat lunch. (Id., pg. 93). Ms. Brown testified "we have a gas station, she could have got [sic] chips or something, but no eating." (Id.).

Ms. Brown does not know if the casino has a written policy regarding ownership of coins left in slot machines by winning bettors. (Id., pg. 60). She admits if a bettor wins, and fails to collect all of the coins, the bettor can return to collect it:

> Q    So if I'm playing the slot machines myself, and say I win 20 coins and I pick up 19, and I forget to pick up the 20th, or I just didn't see it and I walk away, and another patron comes up two minutes later and sees the coin in the slot machine, Motor City Casino considers the coin that I left there their property, and it's not available for someone to pick up and play

11

that coin; is that correct?

A       Correct.  Not unless the player comes back and states this is mine, you know.

(<u>Id</u>., pg. 61).

Ms. Brown does not know how this policy is communicated to the patrons:

Q       But as you sit here, you can't tell me that there is a sign on the wall that says to patrons that if they find a coin in the tray of a slot machine, it is Motor City property, and the patron can't play that coin?

A       There's like little stickers on the machines, but I can't tell you exactly what they say.

Q       You believe those stickers may warn a patron about finding tokens in the trays of slot machines?

A       I don't know.

Q       Where are those stickers located?

A       As soon as you sit down, the sticker is right there on the machines.  I don't know if it's stating that they can't play, I don't know what it's stating, but I know there's stickers up there.

Q       As you sit here, do you know what the stickers refer to?

A       No.  It has something to do with the game though, whatever game they are playing or machine they are on or something.

(<u>Id</u>., pg. 62).

The Motor City Casino's unpublished (and perhaps ex post facto) policy, is,

12

apparently that a nickel left in the tray of a slot machine by a winning bettor is casino property, but a nickel found on the floor of the casino is not the casino's property but may be picked up and played by the finder. (Id., pg. 59). Jack Barthwell of the Motor City Casino admits this policy is not posted in the casino.  Mr. Barthwell told the Detroit Free Press that "people can't take chips or money that don't belong to them". In this same article, however, Mr. Barthwell goes on to state that "players can keep tokens and money they find on the floor."  Mr. Barthwell does not explain how the policy, that is not posted, is communicated to the patrons or why coins abandoned in a slot machine tray do not belong to the person who finds them, yet coins found on the floor of the casino do.  (Exhibit 6).

Ms. Romanski, at her deposition, was asked by Defendants' counsel if she was "aware of any policies or procedures the casino had regarding someone picking up a coin and playing it in another machine?"  Ms. Romanski logically responded "how would I find out about something like that?"  (Stella Romanski Deposition, pg. 16). She was then instructed by her counsel to answer the question and responded "no." (Id.).

Joetta Stevenson, the casino's security shift manager admits that there is no sign anywhere in the casino that "notifies" patrons that they are "not allowed to pick up coins they find in trays", as opposed to keeping coins found on the floor.  (Exhibit 7, Joetta Stevenson's Deposition, pg. 47).   The unpublished policy is never communicated to the patrons until after, according to the casino, they have committed

13

the so-called felony and are "found picking a coin out a tray". (Id.).

Dorothy Dombrowski, Plaintiff's companion the day of the incident and a veteran slot machine player, testified she has previously seen people pick up coins left in slot machine trays without incident. (Dorothy Dombrowski Deposition, pg. 9). Ms. Romanski was told by an employee at the Windsor Casino that she would be entitled to keep a lost coin if she found it in the tray of a slot machine.

## ARGUMENT

A.    SINCE MARLENE BROWN ADMITS PLAINTIFF WAS ARRESTED AND EXCLUDED FROM THE CASINO BECAUSE OF HER "ATTITUDE", A QUESTION OF FACT EXISTS AS TO PLAINTIFF'S FALSE ARREST CLAIMS.

Defendants have set forth the elements of a false arrest claim but claim that there is no question of fact that Marlene Brown had probable cause to arrest Ms. Romanski because they claim she violated the following section of the Michigan Gaming Control and Revenue Act:

> 432.218 **Prohibited conduct violation as felony; violation as misdemeanor; penalties; presumptions; venue.**
> * * *
> (2) A person commits a felony punishable by imprisonment for not more than 10 years or a fine of not more than $100,000, or both, and, in addition, shall be barred for life from a gambling operation under the jurisdiction of the board if the person does any of the following:
>
> * * *
>
> (j) Claims, collects, takes, or attempts to claim, collect or take money or anything of value in or from the gambling games, with intent to defraud, without having made a wager contingent on winning a gambling game, or claims,

14

collects, or takes an amount of money or thing of value of
greater value than the amount won.

Marlene Brown, however contrary to the position she now takes in her Brief,
testified that the only reason Ms. Romanski was arrested was "because of her
attitude." (Marlene Brown Deposition, pg. 60). Ms. Romanski was never charged
with a misdemeanor or a felony. The Michigan State Police, the Michigan Gaming
Commission and the Detroit Police Department were notified about Ms. Romanski's
activities and none saw fit to charge Ms. Romanski with a felony.

The statute requires an element of "intent". Even if the casino can establish
that it owned the coin, a jury certainly could conclude that Ms. Romanski, having
grown up in the Great Depression and would understand the value of a nickel, picked
it up without any intent to defraud the casino or claim to have won without making
a bet. The suggestion that Ms. Romanski was arrested because she committed a
felony is nonsense and is after the fact explanation by the Defendants for their
outrageous conduct in this case.

Moreover, Ms. Brown admits that the coin could be recovered by the previous
player of the machine. (Marlene Brown Deposition, pg. 61). A jury can conclude that
the argument that Ms. Brown was making a "citizens arrest" of a felon is specious
since it was legally impossible for Ms. Romanski to violate the statute, because the
nickel was lost or abandoned property of the previous better. Indeed, the casino and
Ms. Brown would permit Ms. Romanski to pick up and keep the nickel coin if it was
found on the floor. (Marlene Brown Deposition, pg. 63). Had the previous better

15

inadvertently dropped the coin, instead of merely leaving it behind, even Ms. Brown admits Ms. Romanski would be entitled to pick it up.

Based on the following testimony of Joetta Stevenson, the security shift manager, a question of fact exists as to whether the Motor City Casino even has a policy regarding the circumstances of this case:

Q    So I understand, I don't want to put words in your mouth, but you understood that Stella picked up a coin at a machine that wasn't being played and the coin was in the tray, and she picked it up and took it to play it?

A    No.  I understood that she took a coin from a slot machine tray and moved to another machine.

Q    And it's your understanding that violates casino policy?

A    Yes.

Q    Now, is there a written casino policy that prohibits that act?

A    No.

Q    Is there a sign anywhere in the casino that notifies patrons that they are not allowed to pick up coins they find in trays?

A    No.

Q    How is that policy at the casino communicated to patrons?

A    We tell them.

Q    And when do you tell them, as they enter the casino?

16

A    No.

Q    Do you tell them before they pick a coin out of the tray?

A    No.

Q    Do you tell them after they've been found picking a coin out of the tray?

A    Yes.

(Joetta Stevenson Deposition, pgs. 50-51).

There is no dispute that Ms. Romanski was arrested by the Defendants and confined in the security room, against her will for over an hour.  Thereafter, there is evidence that Ms. Romanski felt she was not permitted to leave the valet parking area of the casino from 1:30 p.m. until 3:00 p.m. when she was essentially told to get on the bus and get out-of-town.

A question of fact exists as to Marlene Brown's motives in arresting Ms. Romanski.  Moreover, under Michigan law, the coin was not property of the casino, but was lost or abandoned property.  Ms. Romanski's possessory rights were superior to all but the previous bettor.  Even if the coin was property of the casino, a question of fact also exists as to whether Ms. Romanski had the "intent" necessary to violate the statute.

B.    A QUESTION OF FACT EXISTS AS TO PLAINTIFF'S DEFAMATION CLAIM.

1.    Defendants have failed to raise the "failure to specifically plead" issue as an affirmative defense.

17

Ms. Romanski filed this action in the Wayne County Circuit Court against the casino, Jane Doe and Mary Roe in 2002. At the time she did not know the identities of the individual Defendants who arrested and detained her. The casino filed an answer and affirmative defenses. Neither the answer, nor the affirmative defenses raised the issue of whether Ms. Romanski's defamation claims were specifically plead. M.C.R. 2.111(F)(2) provides:

> A party against whom a cause of action has been asserted by complaint...must assert in a responsive pleading the defenses the party has against them claim. A defense not asserted in the responsive pleading or by motion as provided by these rules is waived...

Plaintiffs' Second Amended Complaint was served in August, 2002. To this date, Defendants have not filed an answer or affirmative defenses to Plaintiff's Second Amended Complaint, and could be determined by this Court to be in default under F.R.C.P. 55.

> F.R.C.P. 12 (a)(2) provides:

> A party served with a pleading stating a cross-claim against that party shall serve an answer thereto within 20 days after being served.

F.R.C.P. 12 (b) provides:

> every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim or third-party claim, shall be asserted in the responsive pleading thereto if one is required. . .

Since this issue has never been raised as an affirmative defense in the federal proceeding, Defendants have waived it. Finally, an amendment under F.R.C.P. 15(b)

to conform to the evidence is appropriate.

      2.    Plaintiff's defamation claim presents a question of fact since Plaintiff, as well as other witnesses have testified that Defendants stated Ms. Romanski committed a crime.

Ms. Romanski testified she was taken to the security room by "four guards". (Stella Romanski Deposition, pg. 12). The "tallest of the three women hovered over me and she says to me I stole a coin from the tray and that's theft." (Id., pg. 13). Thereafter, she was told, again in the presence of three casino employees she lost all her rights. (Id., pg. 18).

Ms. Holman testified an employee of the casino, [Joetta Stevenson] told her "she committed a felony against us, she has no right to eat." (Linda Holman Deposition, pg. 20).

Ms. Holman further testified that Joetta Stevenson told her "when you steal from us, you lose all your rights". (Id., pg. 22). Ms. Dombrowski testified a Motor City Casino security guard [Robert Edwards] told her that Ms. Romanski "stole money from the casino". (Dorothy Dombrowski Deposition, pg. 18).

The elements of a defamation claim are as follows:

      1.    A false and defamatory statement concerning plaintiff;

      2.    An unprivileged publication to a third party;

      3.    Fault amounting to at least negligence on the part of the publisher; and

      4.    Either action ability of the statement irrespective of special harm (defamation per se) or the existence of

> special harm caused by the publication (defamation
> per quad).

Kurz v Evening News Ass'n, 144 Mich. App. 205, 209, 375 N.W.2d 391 (1985)

vacated on other grounds, 428 Mich. 886, 403 NW.2d 805 (187).  Libel is a false

written statement.  Fisher v Detroit Free Press, 158 Mich. App. 409, 404 N.W.2d 765

(1987).  Slander is a false oral statement.   Shannon v Taylor AMC/Jeep, Inc., 168

Mich. App. 415, 425 N.W.2d 165 (1988).  Words that impute the commission of a

crime, constitutes defamation, per se.  M.C.L.A. 600.2911(1).  Under M.C.L.A.

600.2911(7) and individual is entitled to actual damages as well as attorney fees.

Defendants, in their Motion erroneously conclude that since Ms. Romanski

admitted taking the coin, the statements they made were true and therefore, not

actionable.  This argument is one for the jury and not this Court to decide.  A jury

could conclude that Ms. Romanski could not commit a crime because the nickel coin

was not the property of the casino, but lost or abandoned property of the previous

bettor.

Defendants also contend that they did not "publish" the statements and it was

Ms. Romanski who "marketed her situation to various news media" (Defendants'

Brief, pg. 9).  Publication for defamation purposes merely means conveying the

statements to a third party.  In this case, Ms. Romanski testified that Ms. Brown told

her, in the presence of three other individuals she stole a coin.  Ms. Holman testified

that Joetta Stevenson told her that Ms. Romanski "committed a felony" and accused

her of stealing.  Ms. Dombrowski testified Robert Edwards told her that Ms. Romanski

"stole from the casino." The publication element has been met.

As to the qualified privilege to law enforcement agencies, Ms. Romanski is not claiming damages for any statements made by Defendants to the Michigan State Police, Detroit Police Department, or Michigan Gaming Commission. Her defamation claims should go to the jury.

        C.    A QUESTION OF FACT EXISTS AS TO PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM.

The elements of this claim in Michigan are (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. <u>Grahman v Ford</u>, 237 Mich. App. 670, 604 N.W.2d 713 (1999).

It is for the jury and not this Court to determine whether the Defendants conduct was outrageous.

The facts for the jury's consideration include:

    1. Plaintiff, age 73, payed for a day at the casino which included a bus ride on the casino's bus and lunch;

    2. She left Sterling Heights on a Motor City Casino Bus at 11:00 a.m. and was set to return after 5:00 p.m.;

    3. She was arrested by Marlene Brown over a nickel coin "because of her attitude" under a non-published casino policy which the casino communicates after a supposed felony has been committed;

    4. her lunch ticket and players club card points were confiscated without a hearing by the Michigan Gaming Commission and she was kicked out of the casino on one of the hottest days of the year;

21

5. She was confined in the security office from approximately 12:30 p.m. until 1:30 p.m.;

6. When she was permitted to use the restroom, Marlene Brown waited immediately outside the stall while she relieved herself;

7. The atmosphere of the neighborhood around the casino as well as the statements by the casino employees to stay at valet parking prevented Plaintiff from leaving the casino area to find someplace to eat;

8. Her driver's license and social security card were taken and photographed;

9. She was physically confined for almost one hour;

10. Marlene Brown, 36 years younger, went "ballistic" on her and her friend, outside the casino; and

11. Ms. Romanski testified she was embarrassed, humiliated, suffered from diarrhea, and "cried all the way home. Ringing wet."

Under these circumstances, there are sufficient facts under Michigan law for the jury and not the Court to decide Ms. Romanski's intentional infliction of emotional distress claims.

D.    PLAINTIFF'S CIVIL RIGHTS ACTION SATISFIES THE SYMBIOTIC OR NEXUS TEST SET FORTH BY THE SIXTH CIRCUIT COURT OF APPEALS.

Ms. Romanski was arrested by four security guards of the Motor City Casino for, in Defendant Marlene Brown's own testimony, "her attitude." Under Chapman v Higbee, ___ F.3d ___ (6th Cir. 2003), electronic citation 2003WL328837, the Sixth Circuit found, en banc, that a private entity could be subject to a cause of action

22

under 42 U.S.C. §1983.

The Sixth Circuit found that under the symbiotic or nexus test for determining whether a private party is deemed a state actor under 42 U.S.C. §1983, the plaintiff must demonstrate that there is a sufficiently close nexus between the government and the private part's conduct so that the conduct may be fairly attributed to the state itself.  (Id.).

The Sixth Circuit, en banc, held that this "inquiry is fact-specific, and the presence of state action is determined on a case-by-case basis.  (Citations omitted). Although 'it is possible to determine. . .whether a person acted under color of state law as a matter of law, there may remain in some instances unanswered questions of fact regarding the proper characterization of the actions for the jury to decide." (Citations omitted).  The court held that although the "security officer did not represent himself as a police officer, threaten to arrest Chapman, waive his badge or weapon, or establish any contact with the sheriffs department" it did find that "if Chapman did not feel free to leave, as a result of the security officer's sheriff's uniform, his badge, or his sidearm, a reasonable jury could find the detention was a tacit arrest and fairly attributable to the state."  (Id.).  The court found there was a genuine issue of material fact as to whether the security officer acted under "color of state law" when he asked Chapman to enter the fitting room with the sales manager so that her clothes and pursue could be searched.

The court should note that although Judge Richard F. Suhrheinrich dissented

23

as to Chapman's Section 1981 claim, he stated in his dissent "I concur in the majority's analysis of Chapman's claim under 42 U.S.C. §1983, because I believe there is a question of fact as to whether Dillard's may be considered a state actor under the nexus test" (emphasis added).

In this case, Ms. Romanski, a 73 year old grandmother was told by Defendant Marlene Brown that she was a police officer, was surrounded by four people, including, according to Defendant Marlene Brown, "a uniformed officer" (Marlene Brown Deposition, pg. 70) and told to "come with us". She was taken to a security office. Ms. Romanski testified, "They sat me behind the desk. One stood in front of me and a guard stood at the door, the guard that came with us so that I - - so that I couldn't leave." (Stella Romanski Deposition, pgs. 12-13). Ms. Romanski further testified" they asked me to stand up. They took a picture of me, photograph. They asked for my driver's license and they asked for my social security card and I didn't want to give them the card, but I gave it to them because she said she was a police woman (emphasis added) (Id., pg. 17). Ms. Romanski, after she was escorted out onto Grand River, called her friend Linda Holman's cell phone and told her "four policemen - police people arrested her. She thought they were police people." (Linda Holman Deposition, pg. 17).

Defendant Marlene Brown testified that she was a PA 330 certified security police officer. (Marlene Brown Deposition, pg. 25). Moreover, the Michigan State Police and City of Detroit Police Department have officers at the casino, "twenty-four

hours a day, seven days a week." (Id., pg. 36).  Marlene Brown was trained by a Detroit Police Officer and is licensed to carry a gun (Id., pg. 41).  Since Ms. Brown went "ballistic" after this incident, it is perhaps fortunate that she does not carry a gun while on duty.  (Id., pg. 41).  Ms. Brown does carry a "badge" and is authorized to arrest people on the premises of the Motor City Casino.  (Id., pg. 47).  Ms. Brown also carries handcuffs (Id., pg. 41) and a hidden microphone.  (Id., pg. 48).

Ms. Brown testified that when she approached Ms. Romanski, she "flipped up my jacket, and I showed her my badge." (Id., pg. 59).  Ms. Brown further stated, "I lifted up the bottom part, because I always kept my badge and my handcuffs on my belt." (Id., pg. 59).

Pursuant to the Sixth Circuit en banc opinion in Chapman, there is a plethora of evidence for the jury to conclude that under the symbiotic or nexus test, applicable to Section 1983 claims, that one or more of the Defendants in this case were "state actors".  The facts in this case are virtually identical to Chapman.  Although Marlene Brown was not wearing a uniform, she told Ms. Romanski she was a police officer, admitted to "flashing" her badge and handcuffs and confined Ms. Romanski in violation of her civil rights.  Moreover, Marlene Brown, along with "a uniformed officer" and her two partners accompanied Ms. Romanski to the security office. (Marlene Brown Deposition, pg. 70).  Defendant, Joetta Stevenson also a PA330 certified security police officer, testified that the security officers carried handcuffs and a badge (Joetta Stevenson Deposition, pg. 31).  When she saw Ms. Romanski in

25

the room, Marlene Brown was with two uniformed officers. (Id., pg. 39).

It is also suspect that although Defendants claim that Ms. Romanski a 5"1', 145 pound, 73 year old, grandmother was loud and disruptive, no videotape recording exists of her picking up the coin, the initial encounter with Marlene Brown, the taking of Ms. Romanski to the security room and the interview itself. Defendant, Marlene Brown testified that she contacted sky or the surveillance "because before I even move a patron, surveillance has to pick them up on camera." (Marlene Brown Deposition, pg. 48). However, Defendants conveniently claim that none of these videotapes exist. The videotape would certainly establish which version of the facts of this incident actually happened. A jury could certainly conclude that the videotapes do not exist because they would not corroborate the Defendants' version of what happened in this case.

Finally, as Defendants claim, the nickel token was their property and that Ms. Romanski's taking of the token was a felony, why was Ms. Romanski not charged with a felony, by Marlene Brown, a state certified security officer? The answer lies on page 75 of Marlene Brown's Deposition, when she testified that Ms. Romanski was "86ed" or barred from the casino "because of her attitude" and not because she had committed a felony.

Ms. Brown has met her burden of establishing a question of fact as to her section 1983 claim. Ms. Brown and Ms. Stevenson were PA330 certified security policy officers. Ms. Brown told Ms. Romanski she was a police officer and flashed her

26

badge and handcuffs.  Under the nexus test set forth in <u>Chapman</u>, it is for the jury to decide whether the Defendants were 'acting under color of state law'.  It is also for the jury to decide under <u>Chapman</u> whether Ms. Romanski felt "free to leave" at any time when she was arrested by Ms. Brown, surrounded by four security officers including at least one in uniform, taken against her will to a security office, confined in the security office for almost an hour with one officer guarding the door and the other three officers "hovered" over her, and only being permitted to use the restroom with an officer standing outside the stall.

There are sufficient facts to establish that Ms. Romanski's Fourth amendment rights to be free from unreasonable search and seizure and her Fifth amendment rights to due process were taken from.  Both her liberty and property, the nickel coin, her lunch ticket and her players club points were taken from her, because of "her attitude" and not because she committed a felony.

The Motion for Summary Judgment should be denied.

<u>Conclusion</u>

Plaintiff requests that this Court deny the Defendants' Motion for Summary Judgment.

PROOF OF SERVICE

THE UNDERSIGNED CERTIFIES THAT A COPY OF THE FOREGOING INSTRUMENT WAS SERVED UPON THE ATTORNEYS OF RECORD OF ALL PARTIES TO THE ABOVE CAUSE BY MAILING THE SAME TO THEM AT THEIR RESPECTIVE ADDRESSES AS DISCLOSED BY THE PLEADINGS OF RECORD HEREIN WITH POSTAGE FULLY PREPAID THEREON, ON THE 24th DAY OF April , 10 2003. I DECLARE UNDER PENALTY OF PERJURY THAT THE STATEMENT ABOVE IS TRUE TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Dated: April 21, 2003

Respectfully submitted,

NEIL H. FINK (P 13430)
S. DAVID McNEILL (P 17544)
Attorney for Plaintiff
185 Oakland Ave., Ste. 250
Birmingham, MI 48009

27

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

# SEE CASE FILE FOR ADDITIONAL DOCUMENTS OR PAGES THAT WERE NOT SCANNED