UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STELLA ROMANSKI,

    Plaintiff,

vs.

Case No: 02-CV-73358
Hon: Lawrence P. Zatkoff

DETROIT ENTERTAINMENT, L.L.C. d/b/a
MOTOR CITY CASINO, a Michigan
Corporation, MARLENE BROWN, GLORIA
BROWN, ROBERT EDWARDS, and
JOEETA STEVENSON,
Jointly and Severally,

    Defendants.
_____/

NEIL H. FINK (P 13430)
S. DAVID McNEILL (P 17544)
Attorneys for Plaintiff
185 Oakland Ave., Ste. 250
Birmingham, MI 48009
(248) 258-3181

JOHN B. FARRELL (P 27627)
ROBERT F. MacALPINE (P 31626)
Attorney for Def. Detroit Entertainment
1000 Woodbridge
Detroit, MI 48207
(313) 446-1530
_____/

# PLAINTIFF, STELLA ROMANSKI'S TRIAL BRIEF

## Statement of Facts

On the morning of August 7, 2001, Plaintiff Stella Romanski, a 73 year old grandmother, boarded a Motor City Casino bus in Sterling Heights, Michigan with two of her friends, Dorothy Dombrowski and Linda Holman and was driven to the Motor City Casino in Detroit, Michigan. (Stella Romanski Deposition, pg. 8). Ms. Romanski paid $9.00 for a ride on the "senior bus" and a buffet lunch at the Motor City Classic Buffet. (Id., pg. 9). Ms. Romanski was previously issued a players club card by the casino that accumulates points as she gambles that she may redeem with the casino.

Ms. Romanski and her friends arrived at 11:30 a.m. (Id., pg. 10). Ms. Romanski left her friends to gamble and made plans to meet them at 1:30 p.m. for lunch. (Id., pg. 11). At about 12:30 p.m. Ms. Romanski testified she was playing the nickel slot machines. She played one machine, left it, looked at two other machines and came back to the original (Id.). She picked up a nickel coin that had been left in the tray by a winning bettor who played the machine previously. (Id.).

Ms. Romanski testified she then went around to the machine that "I was playing right along and I put $20.00 in and the nickel coin. (Id.). Ms. Romanski played the slot machine "around 13 times. . .and all of a sudden four people surrounded me, three people behind me. . . I stood up. Two were in font [sic] of me and two were in back of me. I was very embarrassed, because everybody was watching us like a criminal, and we went up a escalator, two in front and two in back" (Id., pg. 12).

2

Ms. Romanski was taken to the security office. She testified "They sat me behind the desk. One stood in front of me and a guard stood at the door, the guard that came with us so that I - - so that I couldn't leave." (Id., pgs. 12-13).

Ms. Romanski "asked the tallest of the three women hovered over me" what this was all about "and she says to me I stole a coin from the tray and that's theft. I looked at her and I said what are you talking about? And she said it a couple of more times, I stole a coin and that's theft." (Id., pg. 13). Ms. Romanski responded "I couldn't believe it. I couldn't believe it. I mean I'm a grandmother of nine children and I didn't understand. I just couldn't believe it. I kept saying what are you talking about? I told them that I didn't remember taking the coin, put [sic] if there was a coin in a tray or on the floor, I would have picked it up like anybody else would have. Then I was crying." (Id.).

The Motor City Casino security guards "took my coins that I had in my cup and threw them on the table and counted them. It came to $14.10. She cashed in, brought it back and on the table she laid down a ten, four ones, two nickels and took one nickel that belonged to the casino." (Id.). Ms. Romanski testified they then "took a picture of me, photographed. They asked for my driver's license and they asked for my social security card and I didn't want to give to them the card, but I gave it to them because she said she was a policewomen. And my [players card] that I put in the casino machine, they took that as well." (Id., pg. 17). The casino kept her players card, made photocopies of her driver's license and social security card and

3

returned them to Ms. Romanski. (Id.).

Ms. Romanski looked at her watch "and it was 1:30. I said can I please go down and have lunch, because my friends were downstairs. She said I lost all my rights. And I said what do you mean? And she said you can't go down. I said can I go down and tell my friends that you're kicking me out of the casino? She said no. I lost my rights. I could not go down" (Id., pg. 18).

Ms. Romanski was not permitted to eat lunch. She testified she was told by the security guards that her "bus will be there at 3:00 o'clock, the 109, and I was to get on it." (Id., pg. 19).

As the security guards were escorting Ms. Romanski out of the casino, she said "I'm sick, I'm really sick, could I go to the bathroom? . . . [Defendant, Marlene Brown] followed me into where I went to the bathroom. She was right by my stall. I went to the bathroom and when I came out they escorted me, somebody in front and somebody in back. By then I don't remember if it was two, four or what. We went all the way down and they took me over to a chair. It was valet parking. And they said now you see that over there, way over there? [across Grand River] and I said yes. Your bus will be there at 3:00 o'clock. Board it." (Id., pg. 19).

At 3:00 p.m. the 109 bus arrived and Ms. Romanski testified she did as she was told. "I had to go way down around a four foot wall, cross Grand River at 3:00 o'clock, which is the busiest time, and I saw my bus and it said 109. Then I went to the front of the bus and the bus said it was out of town, it wasn't going where I

4

wanted it to go. It was either Bay City or Saginaw. I think it was Saginaw. But it wasn't going where I had to go. So the bus left. There's no chairs. It was the hottest day and I'm [on Grand River] and no one's there, and I was afraid to go back because they told me not to come back. I was barred from it, and I didn't know what to do." (Id., pg. 20).

Fortunately, Ms. Romanski's friends then came out of the casino to look for her and found her standing outside on Grand River. She testified "I was explaining what had happened and how terrible it was and they said, you know, I just couldn't believe it. And then I just almost got through and the people from the casino came out and my next door neighbor [Dorothy Dombrowski, age 77] says this is really stupid, and the tallest woman, I think her name was Brown [Defendant Marlene Brown, age 38] came up to my neighbor [Ms. Dombrowski] and came right up to her like this and said are you calling me stupid? And [Ms. Dombrowski] says no, I'm saying that this incident was stupid. And she - - [Defendant, Joetta Stevenson] came out and told her Brown, get back into the - - get back into the casino, and [Ms. Brown] said she called me stupid. I thought they were going to fight. I really did. And I was against the wall. (Id., pg. 22). Ms. Romanski further testified Ms. Brown "looked like she was going to beat [Ms. Dombrowski] up." (Id., pg. 23).

Ms. Romanski was escorted across Grand River where she waited with her friends until 5:00 p.m. when her bus came. (Id., pg. 24). Ms. Romanski testified "I was very embarrassed, humiliated. . . . Very shaken up, and wanted just - - I had

5

diarrhea the rest of the day. I didn't eat all that day. I was a mess when I came home because I only had cereal at nine o'clock in the morning. . .I cried all the way home. Ringing wet." (Id., pgs. 26-27).

Linda Holman testified that she was in the casino when Ms. Romanski reached her on her cell phone and said "four policemen - police people arrested her. <u>She thought they were police people.</u>" (Emphasis added) (Linda Holman Deposition, pg. 17). She and Ms. Dombrowski found Ms. Romanski "standing on the corner of the building and she was just shaking. It looked like she was going to pass out and she really couldn't even talk to us right away. She was just shaking." (Id., pg. 16). Ms. Romanski told Ms. Holman "something about they had arrested her because she took a nickel - - she didn't remember taking a nickel - - that was in the slot machine." (Id., pg. 17). Ms. Holman further testified "it was extremely hot. I'm not sure how long we stood out there. We talked, the three of us, trying to figure out what happened. We really couldn't figure out what happened. None of it made sense." (Id., pg. 17). . . .and [Dorothy Dombrowski] said something about, you know, how stupid a situation for that to be, how stupid for them to throw her out and, wow, once she said that, this one larger, tall security guard [Marlene Brown] came right over like over the top of us and was yelling at Dorothy, who are you calling stupid. . .And I mean [Ms. Brown] went out of control. . .This security guard went ballistic on Dorothy. And there was another lady [Joetta Stevenson] came and tried to calm down [Ms. Brown]. When that women came I went and talked to her and asked if Stella could - - you

6

know, she had paid for lunch. I said, you know this lady is about ready to pass out, she needs to eat. I said you know, she has the right to have lunch. She paid for it. . . . [Ms. Stevenson] said no, she didn't have any right to have lunch she has committed a felony against us, she has no right to eat." (Id., pg. 20). . . .I again said she has the right to eat. She's going to faint and [Ms. Stevenson] says when you steal from us, you lose all of your rights." (Id., pg. 22).

Ms. Dombrowski similarly testified she found Ms. Romanski standing outside the casino. (Dorothy Dombrowski Deposition, pg. 15). Ms. Romanski told her "that she was playing the nickel machine and security came and I think she said there were four members who surrounded her and asked her to withdraw whatever money she had put into the machine. As I understood it, she had put a $20 bill in there and to withdrawn the money and to follow them. I think the thought she related to us crossed her mind that she won some sort of prize because they're always advertising they're giving away money for some reason or another." (Id., pg. 15).

Ms. Dombrowski spoke to Defendant [Robert Edwards] and "said what exactly did she do. He said she stole money from the casino. He used the words interchangeably, she committed a larceny and a felony and/or a felony." (Id., pg. 18). Ms. Dombrowski further testified "at some point I said this is the stupidest thing I've ever heard of. . .and Marlene Brown took exception to it, became very belligerent and insisted I called her stupid. And I said I did not. . . .she came right up in to my face and said yes, you did. . .and I said your word is as good as mine and someone at this

7

point pointed out that everything was on tape and I said wonderful, I'm looking forward to seeing it on tape so that I'm vindicated because I did not call her stupid. She is 30, 40 pounds heavier than I am. She was 30 to 40 [years] younger than I am and much taller. (Id., pgs. 18-19). This videotape as well as the videotapes of Ms. Romanski taking the coin, being arrested and her interview in the security office were requested by Plaintiff's counsel in discovery. Even though the casino agreed to a protective order in state court permitting Ms. Romanski to copy the videotapes at her expense, the casino now claims that none of these videotapes exist.

Defendant Marlene Brown testified that when she made the arrest "I always have my badge, but it wasn't out to be seen. But when I approach someone, I'll show them that I'm an officer." (Marlene Brown Deposition, pg. 46). Ms. Brown carries a hidden microphone, because before she can "even move a patron, surveillance has to pick them up on camera." (Id., pg. 48).

Prior to approaching Ms. Romanski, Marlene Brown testified she "flipped up [her] jacket, and I showed [Ms. Romanski] my badge. . .I lifted up the bottom part because I always kept my badge and my handcuffs on my belt." (Id., pg. 59).

Ms. Brown testified that patrons can keep coins they find on the floor. (Id., pg. 60). Ms. Brown admits she doesn't know if there is any written rule that delineates the distinction between coins found in trays and coins found on floors. (Id., pg. 60). Ms. Brown thinks there may be stickers on the machines. (Id., pg. 62).

Contrary to the statements made in her motion that she was simply acting as

a private citizen making a citizens arrest for a felony committed in her presence, Ms. Brown testified "The only reason [Ms. Romanski] was taken to the office is because of her attitude. (Id., pg. 60).

Although Ms. Brown's testified that Ms. Romanski was loud and disruptive, the incident report form that Ms. Brown signed immediately after the incident states "suspect was escorted to security office <u>without incident</u> or injury." (Emphasis added). Ms. Brown, along with a "uniformed officer", Gloria Brown and Robert Edwards accompanied Ms. Romanski to the security office. (Id., pg. 70). The officer had handcuffs that were visible. (Id.). Ms. Brown testified Ms. Romanski was detained in the security office for fifteen to twenty minutes, "It might have been a little longer." (Id., pg. 72).

The room where Ms. Romanski was taken has a camera "monitoring what's going on." (Id., pg. 74). Ms. Brown admits Ms. Romanski's lunch card and the nickel coin were taken from her. (Id.). Ms. Brown, contrary to the position taken in her Brief that Ms. Romanski committed a felony, reiterated in her deposition that Ms. Romanski was excluded from the casino "because of her attitude." (Id., pg. 75).

> Q  And just so I understand, what caused you to ask her to come to the office was because you thought she was talking loud and you wanted her to calm down?
>
> A  Right.
>
> Q  Any other reason?
>
> A  No.

9

(Id., pg. 98).

Ms. Brown admits Ms. Romanski was not permitted to eat lunch. (Id., pg. 93). Ms. Brown testified "we have a gas station, she could have got [sic] chips or something, but no eating." (Id.).

Ms. Brown does not know if the casino has a written policy regarding ownership of coins left in slot machines by winning bettors. (Id., pg. 60). She admits if a bettor wins, and fails to collect all of the coins, the bettor can return to collect it:

> Q  So if I'm playing the slot machines myself, and say I win 20 coins and I pick up 19, and I forget to pick up the 20th, or I just didn't see it and I walk away, and another patron comes up two minutes later and sees the coin in the slot machine, Motor City Casino considers the coin that I left there their property, and it's not available for someone to pick up and play that coin; is that correct?
>
> A  Correct. Not unless the player comes back and states this is mine, you know.

(Id., pg. 61).

Ms. Brown does not know how this policy is communicated to the patrons:

> Q  But as you sit here, you can't tell me that there is a sign on the wall that says to patrons that if they find a coin in the tray of a slot machine, it is Motor City property, and the patron can't play that coin?
>
> A  There's like little stickers on the machines, but I can't tell you exactly what they say.
>
> Q  You believe those stickers may warn a patron about finding tokens in the trays of slot machines?

> A   I don't know.
>
> Q   Where are those stickers located?
>
> A   As soon as you sit down, the sticker is right there on the machines. I don't know if it's stating that they can't play, I don't know what it's stating, but I know there's stickers up there.
>
> Q   As you sit here, do you know what the stickers refer to?
>
> A   No. It has something to do with the game though, whatever game they are playing or machine they are on or something.

(Id., pg. 62).

The Motor City Casino's unpublished (and perhaps ex post facto) policy, is, apparently that a nickel left in the tray of a slot machine by a winning bettor is casino property, but a nickel found on the floor of the casino is not the casino's property but may be picked up and played by the finder. (Id., pg. 59). Jack Barthwell of the Motor City Casino admits this policy is not posted in the casino. Mr. Barthwell told the Detroit Free Press that "people can't take chips or money that don't belong to them". In this same article, however, Mr. Barthwell goes on to state that "players can keep tokens and money they find on the floor." Mr. Barthwell does not explain how the policy, that is not posted, is communicated to the patrons or why coins abandoned in a slot machine tray do not belong to the person who finds them, yet coins found on the floor of the casino do.

Ms. Romanski, at her deposition, was asked by Defendants' counsel if she was

11

"aware of any policies or procedures the casino had regarding someone picking up a coin and playing it in another machine?" Ms. Romanski logically responded "how would I find out about something like that?" (Stella Romanski Deposition, pg. 16). She was then instructed by her counsel to answer the question and responded "no." (Id.).

Joetta Stevenson, the casino's security shift manager admits that there is no sign anywhere in the casino that "notifies" patrons that they are "not allowed to pick up coins they find in trays", as opposed to keeping coins found on the floor. (Exhibit 7, Joetta Stevenson's Deposition, pg. 47). The unpublished policy is never communicated to the patrons until after, according to the casino, they have committed the so-called felony and are "found picking a coin out a tray". (Id.).

Dorothy Dombrowski, Plaintiff's companion the day of the incident and a veteran slot machine player, testified she has previously seen people pick up coins left in slot machine trays without incident. (Dorothy Dombrowski Deposition, pg. 9). Ms. Romanski was told by an employee at the Windsor Casino that she would be entitled to keep a lost coin if she found it in the tray of a slot machine.

## ARGUMENT

### A. 42 U.S.C. §1983

Plaintiff claims both compensatory and punitive damages for a Fourth Amendment violation under 42 U.S.C. §1983 which provides:

> Every person who, under color of any statute, ordinance,

12

> regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action of law. . . .

This Court, on two occasions in its September 19, 2002 Order and it's May 28, 2003 Opinion and Order has determined, as a matter of law that since some of the Defendants were vested with the powers of a police officer under Mich. Comp. Laws §338.1080, these individuals are State actors acting under color of law for purposes of §1983.

Plaintiff alleges a violation of her Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures. Specifically, Plaintiff will show she was arrested, and held without probable cause. The casino alleges that pursuant to an unwritten and unpublished policy, the token belonged to the casino. Despite the existence of an extensive audio and video tapes surveillance system, Defendants can provide no audio or video tapes to show how the nickel token found its way to the slot machine tray. As the Court point out in its opinion, there is "no other likely explanation" than that is was won by a previous bettor, and therefore became property of the bettor and the casino no longer had legal title to the token. Therefore, the Defendants did not have probable cause to arrest Plaintiff for committing a crime.

Additionally, Marlene Brown admits in her deposition that the only reason Plaintiff was taken to the security office and was banned from the casino was

13

because of her "attitude". (Marlene Brown Deposition pgs. 65-66, 75).

Finally, Mich. Comp. Law §423.218(2)(j) states a person commits a felony if that persons:

> claims, collects, takes, or attempts to claim, collect or take money or anything of value in or from the gaming games, with intent to defraud, without having made a wager contingent on winning a gambling game, or claims, collects, or takes an amount of money or thing of value of greater value than the amount won.

There is simply no evidence that Plaintiff had an intent to defraud the casino when she recovered the token.

Under 42 U.S.C. §1983, Plaintiff is entitled to compensatory and punitive damages. The evidence will show that in order to deter future conduct of this nature by the casino, punitive damages are appropriate.

### B. False Arrest and Imprisonment

As stated by the Court in its Opinion:

> Under Michigan law, the elements of false arrest are: 1) an arrest; 2) of a person; 3) who is innocent of the charge on which he is arrested; 4) by the defendant or at his instigation; 5) without legal justification. *See Lewis v. Farmer Jack Div., Inc.*, 327 N.W.2d 893, 901 (Williams, J. dissenting). In turn, the elements of false imprisonment are: 1) actually confining another; 2) intentionally performing the act of confining another; 3) the act of confining another was performed without legal justification; and 4) the victim was aware of the confinement. *See Moore v. City of Detroit*, 652 N.W.2d 688, 691 (Mich. Ct. App. 2002). Michigan courts have held that false arrest is one type of false imprisonment; when a person is falsely arrested, he or she is always falsely imprisoned. *See*

*Moore*, 652 N.W.2d at 690 (citing *Lewis*, 327 N.W.2d at 900-01 n.4 (Williams, J. dissenting)).

Plaintiff will show that all of these elements have been met, as demonstrated by the action of the Defendants in the preceding statement of facts.

Defendants claim a privilege under MCLA 600.2917. However, by definition, the statute only applies to store keepers and librarians and does not apply to the casino.

### C. Defamation

Under Michigan law, there are four elements in a defamation claim: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; (4) and either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod). *See Kefgen v. Davidson*, 617 N.W.2d 351, 356 (Mich. Ct. App. 2000).

Defamation per se, as defined by Mich. Compiled Laws §600.2911(1) includes words that impute the commission of a crime. Under Mich. Compiled Laws §600.2911(7) a plaintiff is entitled to both actual damages as well as attorney fees.

In this case, there is a plethora of evidence that Defendants told Plaintiff she committed a crime in the presence of third parties.

### D. Intentional Infliction of Emotional Distress

Plaintiff's final claim is for intentional infliction of emotional distress. In order

15

to prove a claim for intentional infliction of emotional distress in Michigan, Plaintiff must prove four elements: (1) extreme or outrageous conduct; (2) that intentionally or recklessly; (3) causes; (4) extreme emotional distress. *See Grochowalski v. Detroit Inter-Ins. Exch.*, 430 N.W.2d 822, 824 (Mich. Ct. App. 1988).

The facts for the jury's consideration include:

1. Plaintiff, age 73, payed for a day at the casino which included a bus ride on the casino's bus and lunch;

2. She left Sterling Heights on a Motor City Casino Bus at 11:00 a.m. and was set to return after 5:00 p.m.;

3. She was arrested by Marlene Brown over a nickel coin "because of her attitude" under a non-published casino policy which the casino communicates after a supposed felony has been committed;

4. Her lunch ticket and players club card points were confiscated without a hearing by the Michigan Gaming Commission and she was kicked out of the casino on one of the hottest days of the year;

5. She was confined in the security office from approximately 12:30 p.m. until 1:30 p.m.;

6. When she was permitted to use the restroom, Marlene Brown waited immediately outside the stall while she relieved herself;

7. The atmosphere of the neighborhood around the casino as well as the statements by the casino employees to stay at valet parking prevented Plaintiff from leaving the casino area to find someplace to eat;

8. Her driver's license and social security card were taken and photographed;

9. She was physically confined for almost one hour;

10. Marlene Brown, 36 years younger, went "ballistic" on her and her friend, outside the casino; and

11. Ms. Romanski testified she was embarrassed, humiliated, suffered from diarrhea, and "cried all the way home. Ringing wet."

Under these circumstances, there are sufficient facts under Michigan law for the jury and not the Court to decide Ms. Romanski's intentional infliction of emotional distress claims.

Respectfully submitted,

NEIL H. FINK (P 13430)
S. DAVID McNEILL (P 17544)
Attorney for Plaintiff
185 Oakland Ave., Ste. 250
Birmingham, MI 48009
(248) 258-3181

Dated: July \_\_, 2003